915 So.2d 829 (2005)
STATE OF Louisiana
v.
Henry Lee LEONARD.
No. 2004 KA 1609.
Court of Appeal of Louisiana, First Circuit.
April 27, 2005.
*830 Doug Moreau, Premila Burns, Baton Rouge, for Appellee State of Louisiana.
Christopher A. Aberle, Mandeville, for Defendant/Appellant Henry Lee Leonard.
Before: WHIPPLE, DOWNING, and HUGHES, JJ.
DOWNING, J.
The defendant, Henry Lee Leonard, was indicted by an East Baton Rouge Parish grand jury on August 27, 2003 for one count of second-degree murder, a violation of LSA-R.S. 14:30.1. Through counsel, the defendant waived formal arraignment and entered a plea of not guilty. Following a four-day jury trial, the defendant was found guilty as charged. The defendant was sentenced to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. The defendant now appeals, asserting four assignments of error. For the following reasons, we reverse the defendant's conviction and sentence and remand for a new trial.

FACTS
On July 20, 2003, the defendant, while armed with a .45 caliber pistol, went to Lakeline Direct, a twenty-four hour medical call center where his ex-wife, Leola Leonard, worked, and waited outside the building. According to the defendant, he was a deputy city constable, and he carried a weapon on his person on many occasions, even while not on duty. Ms. Leonard, a nurse, arrived for work at approximately midnight. A metal door with an electronic keypad lock, a surveillance camera, and security patrols protect the building. At approximately 1:30 a.m., the last employee from the earlier shift left the building. At approximately 2:30 a.m., Ken LeDeaux, Ms. Leonard's boyfriend, called and asked if he could stop by to see her for a minute. He arrived shortly after calling, parked next to Ms. Leonard's vehicle, and called her from his cell phone to let her know he had arrived.
At approximately 2:53 a.m., David Howell, a security officer for the security patrol at Ms. Leonard's workplace, arrived for routine patrol. He checked the front of the building to make sure it was locked. He noticed Mr. LeDeaux's and Ms. Leonard's vehicles in the parking lot. He did not see any other vehicles in this side lot. After checking the front of the building, he drove around to the side of the building to make sure the employee entrance side door was also locked. As he checked the door, he saw the defendant sitting on an air conditioning unit. Mr. Howell asked the defendant why he was there, and the defendant told him he was waiting for his wife. The defendant was wearing pajama pants and a pullover shirt.
*831 Mr. Howell called his dispatcher and asked her to call Ms. Leonard to see if she was all right. When the dispatcher asked Ms. Leonard whether she had someone in the parking lot waiting for her, she replied no. Ms. Leonard then walked to the back, disarmed the code, opened the door and saw the defendant. She was not expecting to see him, and she asked him what he was doing there. The defendant replied that he did not know, that he just woke up and something told him to go there. Ms. Leonard told the defendant he knew he was not supposed to be there. The defendant started to walk off. As he approached Mr. LeDeaux's car, he asked her how long Mr. LeDeaux had been there. Ms. Leonard told the defendant, "none of your business." The defendant later claimed he had been to Ms. Leonard's place of employment many times before, and she had never turned him down before when he wanted to talk to her. According to the defendant, he intended to wait for Ms. Leonard to walk Mr. LeDeaux to his car and to then talk to her privately.
While the defendant and Ms. Leonard were talking briefly, Mr. Howell went to check the rest of the building. At that time, Mr. Howell noticed an S.U.V. parked in another parking lot around the corner and up against the building. The defendant told Mr. Howell the vehicle was his, and the defendant started walking toward it as though he were leaving. The defendant also told Ms. Leonard he was leaving. As he walked toward his vehicle, Ms. Leonard went back into the building. At approximately 3:05 a.m., Mr. Howell, noticing the defendant's vehicle was still there, went back to the facility and saw the defendant sitting on the air conditioning unit again.
At approximately 3:30 a.m., Mr. LeDeaux walked out of the building. Ms. Leonard, who was walking with him, went back into the building to set the alarm. Moments later, Ms. Leonard heard three gunshots outside and called 911. From the surveillance camera monitor inside, Ms. Leonard watched as the defendant picked up the body of Mr. LeDeaux and placed it into the trunk of Mr. LeDeaux's vehicle. The defendant then got into Mr. LeDeaux's vehicle and drove away.
Within minutes, a law enforcement officer spotted the defendant driving his vehicle at a fairly high rate of speed across the parking lot, followed him, and then stopped him. When the officer noticed blood on the defendant's body, he notified headquarters, placed the defendant under arrest, and advised him of his Miranda rights. He asked the defendant if he had been shot, and the defendant claimed that he fell and cut his knee. The officer found no injuries on the defendant that would have caused "[anywhere] near the amount of blood" on him, and he again questioned the defendant. The officer asked the defendant whose blood was on him, and the defendant responded only that he was in a state of shock. The officer looked into the defendant's vehicle and saw a cocked semi-automatic.45-caliber pistol on the passenger seat. The weapon had one round in the chamber and nine remaining in the magazine. Subsequent ballistics testing revealed that the two spent bullets and the three shell casings found at the crime scene were fired from the defendant's weapon.
Mr. LeDeaux's vehicle was found by police officers about two-tenths of a mile from the crime scene. Officers found the keys in the car, bloody eyeglasses on the passenger seat, a bloody sheet on the passenger side, and the victim's body in the trunk. They also found a pair of bloody, black Jersey gloves at the scene. Testing revealed that DNA found on the pants and "flip flops" of the defendant, in the parking *832 lot where the shooting occurred, on the driver's seat of the defendant's vehicle, and on the outside of the right and left gloves was consistent with the DNA profile of Kenneth LeDeaux. Also, a mixture of DNA consistent with the profiles of Mr. LeDeaux and the defendant was found in the interior right thumb and index finger of the right-handed glove.
An investigating officer also found a blue notebook in the defendant's vehicle that contained detailed information about Mr. LeDeaux, including his name and address, his pager number, his home, cell, and office phone numbers, and a criminal information unit (C.I.U.) number used by police officers to run a background check on criminal records, driving records, and license plates. Under the C.I.U. number in the defendant's notebook were notations of Mr. LeDeaux's driver's license number and date of birth, the color, make, and model of his vehicle, and the university he attended. The same information was written on several different pages. The officer also found a prior e-mail from Mr. LeDeaux to Ms. Leonard in the glove box of the defendant's vehicle. Testimony revealed that the defendant took this e-mail from Ms. Leonard's wallet, along with her keys, when he entered her unlocked apartment when she was not at home.
After the Leonards' divorce, the defendant would call Ms. Leonard and go to her home and place of employment, often unannounced or uninvited. The defendant knew that Ms. Leonard was seeing Mr. LeDeaux, and the defendant had met and spoken with him on several occasions. While the defendant desired to reunite with his ex-wife, Ms. Leonard told the defendant before the shooting she did not want to reconcile. She also sent the defendant an e-mail shortly before the shooting informing him that she no longer intended to provide financial support to him.

ASSIGNMENT OF ERROR NO. 1
In his first assignment of error, the defendant avers the district court erred in allowing Dr. Shannon Cooper to testify from an autopsy performed by another, in violation of defendant's Sixth Amendment right to confront the witnesses against him. Specifically, the defendant asserts that because Dr. Michael Cramer performed the autopsy, but Dr. Shannon Cooper testified at trial from Dr. Cramer's report, Dr. Cooper's reading of the report constituted inadmissible hearsay.
At trial, the defendant objected to Dr. Cooper testifying based on Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), a recent United States Supreme Court decision. The trial court overruled the defendant's objection after inquiring whether Crawford addressed the issue of one expert testifying about the findings of another expert and receiving an answer from the defendant's counsel in the negative. Though the trial court's ruling was correct, it failed to make the correct inquiry.
The correct order of inquiry is: first, whether the coroner's report was "testimonial hearsay" prohibited by Crawford; second, whether Dr. Cooper is merely reading the report or testifying as an expert based upon the report; finally, if he is testifying as an expert based upon hearsay, whether he is properly qualified as an expert in the field upon which he is testifying.
Under the first prong of our inquiry, we examine whether the coroner's report constituted testimonial hearsay. Testimonial hearsay is prohibited, as explained by the Crawford decision. The Supreme Court clearly states, "not all hearsay implicates the Sixth Amendment's core concerns." The Confrontation Clause applies to "witnesses" against the accused. *833 As noted by Chief Justice Rehnquist and Justice O'Connor in their concurrence, "the Court's analysis of `testimony' excludes at least some hearsay exceptions, such as business records and official records."
Professor George Pugh noted the problem in recognizing a business records exception to the hearsay rule in criminal cases many years before Crawford was decided. Symposium, The Work of the Louisiana Appellate Courts for the 1971-1972 Term, 33 La. L.Rev. 169, 318-319 (1972). In State v. Monroe, 345 So.2d 1185 (La.1977), our supreme court modified its previous rulings in response to Professor Pugh's criticism of the earlier decision in State v. Graves, 259 La. 526, 250 So.2d 727 (1971). In Monroe, the court held that since "the only evidence which strongly tended to corroborate the woman's testimony to the occurrence of sexual penetration, an essential element of the crime, were the hearsay medical examination reports and double hearsay testimony of Dr. Minyard based thereon," the coroner's report was not admissible. Monroe, 345 So.2d at 1190.
Although the opinion stated that the assistant coroner's report was clearly hearsay and did not come within any exception to the rule against hearsay, Justice Marcus noted in his dissent the report would fall under the business records exception to the hearsay rule and further implied that the report was not "testimonial hearsay," although he did not use that phrase. Monroe, 345 So.2d at 1191 (Marcus, J., dissenting).
Monroe allowed an exception where the witness was unavailable and the hearsay was reliable. This exception was used in State v. Prestridge, 399 So.2d 564 (La. 1981).
Because Louisiana Code of Criminal Procedure art. 105 is narrowly drawn, it only allows the coroner's report for non-testimonial hearsay:
A coroner's report and a procès verbal of an autopsy shall be competent evidence of death and the cause thereof, but not of any other fact.
The coroner's report was therefore admissible to prove the cause of death.[1]
The second inquiry is whether Dr. Cooper was simply reading the report or testifying as an expert. Dr. Cooper testified that as the Coroner of East Baton Rouge Parish, he was the legal custodian of all records made and kept by his office. Dr. Cooper was qualified and accepted as an expert in the field of medicine with a specialization in forensic pathology. He reviewed the autopsy report prepared by Dr. Cramer and the autopsy photographs that were taken in this case. Dr. Cooper indicated he was able to testify regarding the autopsy findings and protocol completed by Dr. Cramer.
The coroner or a coroner's deputy may testify as to the victim's death or the cause thereof, even where the testifying witness did not perform the autopsy or prepare the report. See State v. Ducre, 596 So.2d 1372, 1381 (La.App. 1st Cir. 1992).
In the case at hand, the defendant did not dispute that he shot and killed Ken LeDeaux. The defendant, by his own admission at trial, testified that he shot Mr. LeDeaux three times. The autopsy report *834 indicated that the gunshot wounds, particularly the one to his chest, killed Mr. LeDeaux. The only issue argued by the defendant was that the shootings were in self-defense. The autopsy report did not address any legal theory of self-defense. The report simply established that Mr. LeDeaux was shot three times and that he died almost instantly from those gunshot wounds. In this regard, Dr. Cramer's report and Dr. Cooper's expert testimony concerning that report were merely cumulative. We fail to see how they added to or detracted from the factfinder's determination of the veracity of the defendant's testimony regarding why he shot Mr. LeDeaux.
Further, the defendant had ample opportunity to, and, in fact, did cross-examine and recross-examine Dr. Cooper at trial. The defendant was afforded the opportunity to elicit from Dr. Cooper any information he thought might help his case. No harm was suffered by the defendant as a result of his inability to cross-examine Dr. Cramer rather than Dr. Cooper. Dr. Cramer was not a witness against the defendant. Moreover, we recognize that a coroner often prepares the autopsy report without detailed knowledge of the other facts of the case or even any knowledge of who the defendant might be. Either medical expert could have testified to the same evidence, i.e., the contents of the autopsy report.
We need not reach the third inquiry because we conclude that the coroner's report was not "testimonial hearsay" and that Dr. Cooper's testimony was limited to the contents of the autopsy report.
This assignment of error alleging a violation of the holding in Crawford is without merit.

ASSIGNMENT OF ERROR NO. 2
In his second assignment of error, the defendant avers the district court erred in failing to grant the defendant's motion for mistrial after the prosecutor intentionally elicited inadmissible evidenceevidence that had been expressly excluded by the court after a pre-trial Prieur hearing. In the Prieur hearing and ruling, the trial court ruled that the State could not use evidence of the defendant's convictions for familial battery and threats since this evidence constituted improper character evidence. The State sought supervisory review of this issue and this court denied writs.
At trial, the defendant testified on direct examination as follows:
Q. And, Henry, let's get this out right now. For the record is it fair to say that on June 1st of '01 you pled guilty to a misdemeanor simple battery charge; is that correct?
A. That is correct.
Q. And the judge actually sentenced you under article 894; gave you six months parish prison, suspended the sentence, and a hundred dollar fine and court cost; is that correct?
A. That is true; that's true.
Q. And did you plead guilty to that charge?
A. Yes, I did.
Q. And that's a simple battery; is that correct?
A. That was simple battery, yes.
Then, on cross-examination by the prosecutor, the following exchange occurred:
Q. Mr. Leonard, let's start first of all talking about the conviction that you have told this jury that you [sic] for simple battery.
A. Yes. I was convicted for simple battery, which I pled to.
Q. And I'm going to read that. "Battery is the intentional use of force or *835 violence upon the person of another." That's what you pled guilty to; is that correct?
A. That is correct.
Q. That was your daughter; your fourteen-year-old daughter was the victim of that battery?
At this point, defense counsel approached the bench and asked for a mistrial. At a bench conference, the court informed the prosecutor that she could go into details about the sentence but not into any details about the facts of the crime. The defendant did not request the court to admonish the jury to disregard the remark concerning the defendant's fourteen-year-old daughter.
The defendant contends that a mistrial was warranted pursuant to LSA-C.Cr.P. art. 771 which states, in pertinent part:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
(1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770 ...
* * *
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
The State contends that pursuant to LSA-C.E. art. 609.1(C)(3), which allows as admissible the details of convictions when the probative value outweighs the danger of unfair prejudice, confusion of the issues, or misleading the jury, the prosecutor's intent in identifying the defendant's fourteen-year-old daughter as the victim of the battery was to eliminate confusion. According to the State, "the implication that the defendant had battered a family member could have led the jury to conclude he pled guilty to battering his ex-wife" instead of his daughter. Thus, the State argues, the prosecutor's comment, as "one small detail," was appropriately aimed at clarifying the issues, not confusing them. We reject this argument by the State as meritless and unsupported by the record.
Before the prosecutor made the comment regarding the defendant's daughter, none of the testimony elicited regarding the battery made any reference to any family member. Thus, contrary to the State's assertion, there could not have been any implication that the defendant battered some unknown family member since the first and only time the jury became aware of the status (or identity) of the victim of the battery was when the prosecutor deliberately made it known. Nothing in the record suggests that the jury, based on the admission by the defendant on direct examination that he was convicted of a simple battery, could have mistakenly inferred that the victim of the defendant's battery was his ex-wife prior to the prosecutor making her comment about the defendant's daughter.
More importantly, the application of LSA-C.E. art. 609.1 is limited to evidence of prior convictions in connection with impeachment of the credibility of the witness. See State v. Powell, 28,788, p. 9 (La.App.2d Cir.11/1/96), 683 So.2d 1281, 1286. Thus, even in the context of possible jury confusion, LSA-C.E. art. 609.1(C)(3) creates a balancing test in which probative value refers to relevancy of the evidence as to the credibility of the *836 defendant, not to the defendant's character. See Powell, 28,788 at p. 7, 683 So.2d at 1286. The third exception of Article 609.1(C) allows cross-examination into the details of a prior conviction only where the issue of the witness' credibility is raised and the details of the prior conviction are probative in impeaching his testimony and not outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Powell, 28,788 at p. 8, 683 So.2d at 1286.
The State's contentions that the prosecutor commented on impermissible details about another crime in order to prevent jury confusion and that such comments are allowed pursuant to LSA-C.E. art. 609.1(C) are not persuasive. Here, the comment seemingly was made to show bad character on the part of the defendant. Regardless of the reason, the prosecutor's comment was impermissible, especially in light of the Prieur hearing where the trial court specifically ruled that the State could not introduce any evidence regarding the defendant's prior conviction for simple battery, since to do so would be an attempt to show bad character or to introduce character evidence that is not admissible under the circumstances. The issue, thus, is whether this deliberate comment by the prosecutor regarding impermissible details of another crime was sufficient to warrant a mistrial, as asserted by the defendant.
A mistrial under the provisions of LSA-C.Cr.P. art. 771 is generally at the discretion of the trial court and should be granted only where the prejudicial remarks of the witness, or in the case at hand, of the prosecutor, make it impossible for the defendant to obtain a fair trial. See State v. Miles, 98-2396, p. 4 (La.App. 1st Cir.6/25/99), 739 So.2d 901, 904. Nevertheless, in situations where the witness' impermissible reference to another crime was deliberately elicited by the prosecutor, the jurisprudence has held that the impermissible reference is imputable to the State and mandates a mistrial. Miles, 98-2396 at p. 4, 739 So.2d at 904.
We are mindful that the prosecutor in the case at hand did not make reference to another crime, per se, but only commented on details of another crime that had already been referred to and made part of the record by defense counsel on direct examination of the defendant. Nevertheless, the comment by the prosecutor regarding the victim of the battery was an impermissible one that falls within the ambit of Code of Criminal Procedure article 771.
If we do not enforce a ruling designed to ensure a defendant a fair trial in a case where the prosecutor violated a specific instruction to adhere to the ruling, we cannot expect fair trials. See James E. Boren And Michael A. Fiser, Fear of a Paper Tiger: Enforcing Louisiana's Procedural and Statutory Rules in the Wake of Harmless Error Analysis, 64 La. L.Rev. 5 (2003).
Accordingly, we find merit in this assignment of error. We conclude that the trial court abused its discretion in failing to grant a mistrial based on the prosecutor's calculated violation of the trial court's order, resulting in the denial of the defendant's right to a fair trial. Accordingly, we reverse the judgment of the trial court and remand for a new trial.

ASSIGNMENT OF ERROR NO. 3
In his third assignment of error, the defendant avers the district court erred in overruling the defendant's objection and denying his motion for mistrial based on the prosecutor's references to his post-arrest silence.
In separate lines of questioning of two law enforcement officers, the prosecutor *837 made reference to the defendant's post-arrest silence. The defendant did not object to these allegedly inappropriate and inadmissible references immediately after they were made, and in his brief admits to failing to do so. Notably, the defendant did not complain of the prosecutor's line of questioning until the day after the alleged violations.
While the defendant did object during the direct examination of Officer James Cutrer, the objection was made to the introduction of an allegedly inculpatory statement by the defendant that was not provided to defense counsel in pre-trial discovery. This objection, which the trial court overruled, had nothing to do with any impermissible references to the defendant's post-arrest silence following Miranda warnings. See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
Under LSA-C.Cr.P. art. 841, a contemporaneous objection is required to preserve an error for appellate review. The purpose of the contemporaneous objection rule is to allow the trial judge the opportunity to rule on the objection and thereby prevent or cure an error. State v. Hilton, 99-1239, p. 12 (La.App. 1st Cir.3/31/00), 764 So.2d 1027, 1035. The defendant did not make a contemporaneous objection following the statements made by the officers. Irregularities or errors cannot be availed of on appeal if they are not objected to at the time of the occurrence. State v. Walker, 94-0587, p. 4 (La.App. 1st Cir.4/7/95), 654 So.2d 451, 453. Since the defendant failed to lodge a contemporaneous objection on this ground during trial as required by LSA-C.Cr.P. art. 841, he is precluded from raising the issue on appeal.
This assignment of error lacks merit.

ASSIGNMENT OF ERROR NO. 4
In his fourth assignment of error, the defendant avers the evidence was insufficient to support the conviction of second-degree murder. Because we reverse and vacate the conviction and remand to the trial court for re-trial, we pretermit this assignment of error as moot.

DECREE
For the above reasons, we reverse the defendant's conviction and sentence and remand this matter for a new trial.
REVERSED AND REMANDED.
HUGHES, J., concurring.
Code of Criminal Procedure article 770 provides that a mistrial shall be ordered when a remark or comment is made within hearing of the jury by the district attorney referring to another crime committed by the defendant as to which evidence is not admissible.
In this case the defense addressed a prior simple battery conviction by the defendant. A Prieur hearing was held and the trial court specifically ruled evidence of this crime inadmissible in defendant's murder trial. The state sought to overturn the trial court decision by taking writs to the court of appeal and the supreme court. All writs were denied, affirming the trial court decision.
Yet despite overwhelming evidence of guilt in the murder case, the prosecutor asked the question "That was your daughter; your fourteen year old daughter was the victim of that battery?" thus placing squarely before the jury the inadmissible other crimes evidence.
I truly wish this case was governed by article 771, which is discretionary rather than mandatory, because clearly this could be considered a case of harmless error and the conviction affirmed. However, I *838 believe this case can only be governed by article 770, which requires that "a mistrial shall be ordered," leaving no choice or discretion in the matter.
Given the overwhelming evidence of guilt in the murder trial, the inadmissible "other crimes" evidence was clearly harmless and a mistrial will be a horrific result for society in general and for the family of the victim in particular. However, we are all of us under a duty to follow the law.
Therefore, I respectfully concur.
WHIPPLE, J. concurring in part and dissenting in part.
I concur in the majority's analysis and rejection of the Crawford violation alleged by the defendant in assignment of error No. 1. As the majority correctly concludes, there was no Crawford violation herein. I also agree with the majority's conclusion that any error attributable to the prosecutor's reference to the defendant's post-arrest silence was not presented for review on appeal.
However, I respectfully dissent from the majority's conclusion that the district court erred in refusing to grant a motion for mistrial and the conclusion that the defendant's conviction for second degree murder accordingly should be reversed.
While I agree that the conduct by this experienced prosecutor was inappropriate and that the explanations offered by the State appear to be pretextual, I am unable to agree that the defendant was deprived of a fair trial after my review of the full record of these proceedings. Given the strength of the prosecutor's case, the improper evidence elicited by the prosecuting attorney was seemingly unnecessary for the State to obtain a conviction. Thus, I agree with the majority that this questioning by the prosecutor was made to show bad character on the part of the defendant and in contravention of the trial court's specific ruling after a Prieur hearing. Nonetheless, I find that given the confession of the defendant and the issues at trial, the verdict was not improperly rendered in this case.
In the instant case, the defendant admitted on the stand that he shot the victim three times. The identification of the defendant as the killer was not an issue. The sole issue in this case was whether or not the defendant acted in self-defense. Based on the circumstances of this case, I find that the defendant could not possibly have been prejudiced by the prosecutor's comment regarding the victim of the defendant's prior battery.
At trial, the defendant freely admitted that while he thought the victim had a gun, no gun was found at the scene of the shooting. In fact, after shooting and killing the victim, the defendant claimed he searched all over the victim's vehicle, including in the glove compartment and center console, on the ground, and underneath the vehicle for a gun, but never found one. Thus, in my view, the details of the defendant's actions in the prior simple battery simply did not bear upon, or relate in any way, to the issue in this case where the crux of the issue was self-defense. See State v. Powell, 28,788, p. 13 (La.App. 2nd Cir.11/1/96), 683 So.2d 1281, 1289, writ denied, 97-0092 (La.5/30/97), 694 So.2d 243. Pretermitting further comment on the prosecutor's conduct herein, and the wisdom of the approach taken by the State, the State's evidence unquestionably was enough to refute the defendant's claim of self-defense. As such, I conclude the guilty verdict was unattributable to any error in admitting evidence concerning a detail of the defendant's prior conviction. On this record, I find no indication that the defendant was unable to obtain a fair trial. In sum, I am convinced beyond a reasonable *839 doubt that the admission of this one detail of the defendant's prior conviction of simple battery, does not warrant a retrial. See State v. Miles, 98-2396, pp. 4-5 (La. App. 1st Cir.6/25/99), 739 So.2d 901, 904-905, writ denied, 99-2249 (La.1/28/00), 753 So.2d 231; see Powell, 28,788 at pp. 12-13, 683 So.2d at 1289.
For these reasons, I respectfully concur in part, and dissent from the reversal of the defendant's conviction and sentence.
NOTES
[1] The Crawford holding may result in the reversal of the decision in State v. Holmes, 258 La. 221, 245 So.2d 707 (La.1971). There the issue was whether the victim died of a penknife wound or because of a heart attack. Justice Tate, in his dissent, raised the confrontation issue. In such an instance where the manner of death is determinative of guilt or innocence, this author recommends that the trial court err on the side of caution.