NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2019 KA 0362

STATE OF LOUISIANA

VERSUS

FITZPATRICK P. WILLIAMS

*Judgment Rendered:*    FEB 2 6 2020

* * * * * * * *

Appealed from the
21st Judicial District Court
In and for the Parish of St. Helena
State of Louisiana
Case No. 19375A

The Honorable M. Douglas Hughes, Judge Presiding

* * * * * * * *

Bertha M. Hillman
Covington, Louisiana

Counsel for Defendant/Appellant
Fitzpatrick P. Williams

Patrick Williams
Angola, Louisiana

Appellant
Pro Se

Scott M. Perrilloux
District Attorney
Patricia Amos
Assistant District Attorney
Amite, Louisiana

Counsel for Appellee
State of Louisiana

* * * * * * * *

BEFORE: McDONALD, THERIOT, AND PENZATO, JJ.

**THERIOT, J.**

Defendant, Fitzpatrick Williams, was charged by bill of indictment with second degree murder, a violation of La. R.S. 14:30.1. He pled not guilty. After a trial by jury, defendant was found guilty as charged. The trial court imposed a term of life imprisonment at hard labor, to be served without the benefit of probation, parole, or suspension of sentence. Defendant now appeals. For the following reasons, we affirm the conviction and sentence.

## STATEMENT OF FACTS

On the evening of October 8, 2007, Darnell Williams, Hakeem Lee, Myron Hughes, and a few others gathered at Ronny Whitley's mobile home on Calmes Road in St. Helena Parish to barbecue.[1] During the course of the evening, Ronny, Hakeem, and Myron became engaged in an argument with Samuel Williams and Jesse Thomas while standing near the road in front of Ronny's home. After the argument, Samuel and Jesse left.

About fifteen to twenty minutes later, the two men returned to the street in front of Ronny's home, accompanied by defendant. Defendant confronted Myron while armed with a chrome handgun. During the confrontation, defendant fired the handgun, fatally shooting Myron in the right leg. Myron's autopsy revealed that he "sustained a graze wound to his wrist, which entered his right thigh and then exited the side of his right thigh, resulting in the severance or cutting of – or cutting through completely of his right femoral artery, which is the main artery that supplies blood to [the] lower leg[.] . . . [H]e died as a result of that particular wound that he sustained."

There was evidence introduced at trial to indicate Jesse was also shot, though it is unknown by whom.

---

[1] Ronny testified at trial that Darnell and Hakeem are his brothers and that Myron was his cousin. Myron lived across the street from Ronny.

2

Defendant appeals his conviction, asserting one counseled assignment of error and three pro se assignments of error.

## COUNSELED ASSIGNMENT OF ERROR #1 AND PRO SE ASSIGNMENT OF ERROR #1: INSUFFICIENT EVIDENCE[2]

In his counseled assignment of error, defendant argues that there is insufficient evidence in the record to support the conviction. Defendant further asserts that the record supports a finding of justifiable homicide. Alternatively, defendant argues that the evidence only establishes that defendant committed manslaughter. Additionally, in his first pro se assignment of error, defendant reiterates that the evidence is insufficient to support his conviction, and further argues that the testimony introduced against him at trial was neither credible nor reliable.

A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The **Jackson** standard of review, incorporated in La. Code Crim. P. art. 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that, in order to convict, the factfinder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. **State v. Dyson**, 2016-1571 (La. App. 1st Cir. 6/2/17), 222 So.3d 220, 228, writ denied, 2017-1399 (La. 6/15/18), 257 So.3d 685. When direct evidence is viewed in a light most favorable to the

---

[2] Both defendant's counseled assignment of error and his first pro se assignment of error assert that defendant's conviction is based on insufficient evidence. Accordingly, we address these assignments of error concurrently.

3

prosecution, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. **State v. Brothers**, 2017-0870 (La. App. 1st Cir. 11/1/17), 233 So.3d 110, 113, writ denied, 2017-2160 (La. 10/8/18), 253 So.3d 803.

An appellate court is constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases; that determination rests solely on the sound discretion of the trier of fact. **State v. Cockerham**, 2017-0535 (La. App. 1st Cir. 9/21/17), 231 So.3d 698, 705, writ denied, 2017-1802 (La. 6/15/18), 245 So.3d 1035. The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. The fact that the record contains evidence that conflicts with the testimony accepted by the trier of fact does not render the evidence accepted by the trier of fact insufficient. Unless there is internal contradiction or irreconcilable conflict with the physical evidence, the testimony of a single witness, if believed by the factfinder, is sufficient to support a factual conclusion. **State v. Moultrie**, 2014-1535 (La. App. 1st Cir. 12/14/17), 234 So.3d 142, 146, writ denied, 2018-0134 (La. 12/3/18), 257 So.3d 1252. Moreover, when there is conflicting witness testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. **State v. Ruffen**, 2018-1280 (La. App. 1st Cir. 2/28/19), 2019 WL 968412, at *4, writ denied, 2019-00564 (La. 9/6/19), 278 So.3d 971.

**Justifiable homicide**

A homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. La. R.S. 14:20(A)(1). However, a person who is the aggressor or who brings on a difficulty

4

cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict. La. R.S. 14:21. When self-defense is raised as an issue by a defendant, the State has the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. The issue is whether or not a rational factfinder, viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that a defendant did not kill the victim in self-defense. **State v. Patorno**, 2001-2585 (La. App. 1st Cir. 6/21/02), 822 So.2d 141, 147.

At trial, the State presented the testimony of three eyewitnesses, Darnell, Hakeem, and Ronny. Darnell testified that, on the evening of October 8, 2007, he was barbequing at Ronny's mobile home, which was located on Calmes Road in St. Helena Parish. With him that night were Ronny, Hakeem, Trevor Lee, Brandon Perry, and Myron. Myron lived across the street from Ronny. During the evening hours, Darnell noticed that Ronny, Hakeem, and Myron were in the road in front of Ronny's home having a verbal argument with two men, Samuel and Jesse.[3] When asked whether the altercation was between Myron and Samuel or Myron and Jesse, Darnell indicated that he was not sure, but that he thought Myron had been arguing with Samuel. The argument subsided, and Samuel and Jesse left the scene.

About fifteen to twenty minutes later, however, the two men returned accompanied by defendant. Darnell saw defendant approach with a chrome handgun in his hand. According to Darnell, defendant and Myron exchanged words, "kind of bumped chests[,]" and defendant "backed up, pointed the gun in [Myron's] chest, aimed it down, shot." Darnell explained that afterwards, he saw Myron fire a gun "a good bit of times" after he had been shot. Darnell fled to a nearby car, armed himself, and shot into the air because he saw defendant continuing to approach Myron. Darnell

---

[3] Jesse was often referred to as "Rosco" during the trial.

unequivocally testified that he saw defendant shoot first and that Myron was not the aggressor in their confrontation. Darnell saw Myron attempt to run away after being shot, but fell to his knees. He also saw Ronny start attending to Myron, but Darnell admitted he left soon thereafter. Although Jesse was also shot, Darnell testified that he did not see this happen.

Hakeem testified that he was at Ronny's home on the night of the shooting. According to Hakeem, Myron was present along with Hakeem's brothers Trevor, Ronny, and Darnell. Hakeem testified that he was involved in an initial verbal altercation with Samuel and Jesse, the subject of which he did not recall. Samuel and Jesse eventually left, only to return soon thereafter with an armed defendant. He explained that he saw Myron and defendant approach each other and tussle for the gun defendant was carrying. The two broke apart, defendant stepped back, aimed down, and fired two shots with a chrome gun. Hakeem speculated that it did not appear that defendant wanted to shoot Myron. After the first two shots, Hakeem ran away and heard "lots" of additional gunshots, but did not see who was firing them. Though he initially stayed at the scene, he did not know Myron or Jesse had been shot. He left when police arrived.

Ronny also testified on behalf of the State. Ronny was Myron's cousin, owned the residence where the shooting occurred, and was present that night. Ronny testified that Jesse and Myron had had conflicts prior to that night. Ronny explained that Myron was attempting to date Jesse's sister, Natasha Brumfield.

That night, Ronny saw Jesse pull up and start "mouthing off[.]" Jesse then left and came back in a car, parked down the street, and walked back up to Ronny's home. He described defendant walking up and pulling out a gun, after which there was a "tussle" between defendant and Myron. Ronny testified that during the "tussle", "the gun went off" twice. Ronny described the "tussl[e]" as Myron reaching for the gun that defendant had pulled out. Specifically, Ronny described Myron's action as, "If

[you] pull a gun out and [you] point it at [me], I reach for it to try to keep from getting shot." According to Ronny's testimony, Myron was able to get a hand on the gun as it fired.

Following the initial gunshots, Ronny fled the scene and heard "a lot of gunshots." He did not know who else may have been firing a gun. He came back shortly thereafter, and found Myron had been shot. Ronny attempted to put Myron in the car, but Myron "just fell to his knees." Ronny stayed with Myron until he died. Ronny did not see anyone remove the clothing Myron was wearing and observed Myron was wearing clothes when he was shot. Ronny did not see Myron or Jesse with a gun, only defendant.

Detective Joe Chaney of the St. Helena Parish Sheriff's Office was the lead investigator on the case. Det. Chaney testified about his arrival at the scene and the actions he took to secure the evidence at the scene. Det. Chaney later interviewed defendant twice as a suspect. Defendant did not testify at trial. Defendant gave a recorded statement that was entered into evidence and played for the jury. Defendant told Det. Chaney that Samuel and Jesse came into his house complaining of "some boys messing with them[.]" Upon hearing that, defendant got into a car with them to return to the location of the other men. Det. Chaney initially testified that he was unable to determine if anyone else fired a gun at the scene, but he acknowledged seizing a gun from Darnell. However, after the jury again viewed a portion of the recorded interview he had with Darnell, Det. Chaney acknowledged that he learned there were multiple shots fired, but he did not know how many guns were at the scene during the shooting. He testified that he never found a gun that either Myron or Jesse may have had.

Det. Chaney also interviewed Trevor, Darnell, Jesse, and Natasha. In the interview with Natasha, she explained that Jesse was armed during the confrontation and had been the one to shoot Myron. According to Det. Chaney, Natasha's statement

was not consistent with any of the other statements collected in his investigation. Det. Chaney explained there was never a determination of how Jesse came to be shot or who had shot Jesse.

Sergeant Michael Neal of the Louisiana State Police testified that he was one of the detectives to be dispatched to the Calmes Road crime scene, and he participated in the interviews of defendant. Sgt. Neal explained that defendant told him he was sleeping or about to go to sleep when he heard gunshots outside. Defendant then went to where the gunshots took place and found that Jesse had already been shot. Sgt. Neal testified defendant then stated that he brought Jesse to the hospital. Eventually, defendant changed his story to being awoken from his sleep by Jesse's sudden entrance into his home. After Jesse told defendant about the confrontation in front of Ronny's house, defendant got into a car with Jesse and Samuel and the men returned there together. Upon arriving, defendant and three other men, including Jesse, walked toward the other group with whom there had been the previous confrontation. Defendant admitted to Sgt. Neal that he was armed at the time, but there was no revised explanation made to Sgt. Neal as to how Myron and Jesse came to be shot. Sgt. Neal did not interview Jesse, but he did interview Samuel.

Detective Gary Cannon, also of the St. Helena Parish Sheriff's Office, was an investigator and one of the first to arrive at the scene. Immediately upon arriving, bystanders pointed out the "car that shot Myron[,]" and Det. Cannon pursued it. The car was stopped about two miles from where Det. Cannon first encountered it, and defendant was revealed to be the driver. From there, defendant was transported to the sheriff's office, and Jesse was transported for medical care. Detective Lee Carmona similarly arrived early to the scene of the shooting and assisted Det. Cannon in the pursuit of the vehicle. Det. Carmona reported that defendant was not armed at the time of the stop.

Louisiana State Police Detective Oliver Jackson arrived at the scene about an hour-and-a-half after the initial call to police. He was tasked with locating and identifying evidence. He located a revolver in a ditch after being advised by other officers that there may be one present, but left the collection to another officer. The State introduced photographs of the scene and other physical evidence through the testimony of Det. Jackson. Det. Jackson introduced the entry log, indicating which law enforcement officers came and went from the scene. Myron's father, Ronnie Whitley, and other family members' names were also reflected on the entry log, though Det. Jackson indicated it may have been because they were already on scene and they were recording that fact. Det. Jackson also testified that Myron's body appeared to be missing some clothing.

Dr. Karen Ross, a forensic pathologist, performed Myron's autopsy. Dr. Susan Garcia, the chief forensic officer of the Jefferson Parish Forensic Center, testified regarding Dr. Ross's autopsy findings.[4] Dr. Garcia was presented as an expert witness to the jury without objection to her expertise. Dr. Garcia testified that Myron received a graze wound to his right wrist from a bullet that then traveled from his right buttock through his right thigh, cutting his right femoral artery. In sum, the bullet went "from [Myron's] back to the front[.]" Myron died from the leg wound. Dr. Ross visually determined the gunshot wound was not consistent with a contact wound and originated from at least three feet away. Dr. Garcia conceded that heavy clothing would mask the distance and that Dr. Ross only noted that Myron had on boxer shorts at the time of the autopsy. Dr. Garcia also noted, on cross-examination, that there was no gunshot residue evidence collected, but also did not know if the residue test had been performed

---

[4] Dr. Ross was unavailable for trial, and the State sought to introduce the result of the autopsy through her colleague, Dr. Garcia. Defendant objected on the grounds that he would not be able to effectively cross-examine Dr. Garcia on Dr. Ross's nine-year-old autopsy report. The objection was overruled. The matter will be discussed further in defendant's second pro se assignment of error.

on Myron. Dr. Ross concluded, and Dr. Garcia agreed, that the cause of death was homicide.

The State's final witness was Patrick Lane, an employee of the Louisiana State Police Crime Lab, who was accepted without objection by the trial court as an expert in forensic science. Mr. Lane introduced several other photographs of the scene that Det. Jackson was unable to identify in his testimony and discussed the revolver retrieved at the scene. There was no DNA or fingerprint evidence forensically recovered from the gun. There was no direct forensic determination made of whether the handgun was the one used to shoot Myron or Jesse, as no spent bullets or bullet fragments were recovered at the scene or from Myron's body as the bullet passed through and did not lodge in his leg. There were, however, spent cartridges still in the gun, which bore marks consistent with being fired in that gun. Mr. Lane also explained the locations of where all the evidence was recovered at the crime scene using a map entered into evidence. Also recovered from the scene were shorts believed to belong to Myron, but that were not found on his body. The vehicle Myron's body was found next to was not believed to be involved in the crime and was not processed for evidence.

Each witness testified that they saw defendant, in the company of Jesse and Samuel, approach Myron, and after a confrontation, shoot him. There were some differences in the descriptions of how Myron exactly came to be shot, with Ronny testifying Myron grabbed the gun as it fired, whereas Darnell and Hakeem both testified to defendant backing away before shooting Myron. The forensic evidence indicated there was no stippling or evidence of close contact at the time Myron was shot, consistent with the testimony of both Hakeem and Darnell. The three eyewitnesses indicated that while there had been a verbal altercation between Jesse and Myron, Jesse left without incident before returning with defendant. Darnell, Hakeem, and Ronny all saw defendant at the scene with a gun.

10

In defendant's first statement to police, he asserted that he was awakened by gunshots and arrived at the scene after Jesse had already been shot. This differs from the second statement, which is described below. A finding of purposeful misrepresentation reasonably raises the inference of a "guilty mind." Furthermore, lying has been recognized as indicative of an awareness of wrongdoing. **State v. Quinn**, 2018-0664 (La. App. 1st Cir. 3/27/19), 275 So.3d 360, 371.

In defendant's second statement to police, he stated that he was asleep at his house when Jesse entered defendant's home. Defendant further stated that Jesse drove defendant and Samuel back to the area where the previous confrontation had occurred. By all accounts, defendant joined them voluntarily. According to Hakeem and Ronny, defendant instigated the conflict with Myron, with whom he had no prior known disagreement, and then fatally shot him. Darnell testified that defendant approached Myron and the two "had a few little words," "walked up close," and "kind of bumped chests," at which point defendant backed up and shot Myron. Though defendant makes claims to the contrary, there was no evidence introduced at trial that supports his theory on appeal that defendant intentionally shot a gun out of Myron's hand after Myron had shot Jesse and that it was only a "freak accident" that led to Myron's death. Several witnesses testified about numerous shots being fired, and one witness even identified Myron as having fired a gun, but all of the witnesses stated those shots were fired after defendant fired the first shots. Hence, the timing of the additional shots heard or seen by the witnesses could have been viewed by the jury as being inconsistent with defendant's claim that he shot in self-defense or in defense of Jesse.

In finding defendant guilty, the jury clearly rejected his claim of self-defense and concluded that the use of deadly force under the particular facts of this case was neither reasonable nor necessary. The consistent testimony of the State's witnesses

11

was that defendant arrived at the scene, engaged in an altercation with Myron, and subsequently shot him.[5]

Based on the evidence, a juror could have reasonably concluded that defendant, armed with a handgun, arrived at a gathering at which he was otherwise not present, and inserted himself into a conflict that had previously not been physical. Testimony from the State's eyewitnesses consistently placed the responsibility for the shooting on defendant. A rational juror could have reasonably concluded beyond a reasonable doubt that Myron's killing was not necessary to save defendant or Jesse from the danger envisioned by La. R.S. 14:20(A)(1), and as such, defendant was not entitled to claim self-defense. See La. R.S. 14:21.

## Specific intent

Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1); **State v. Gregoire**, 2013-0751 (La. App. 1st Cir. 3/21/14), 143 So.3d 503, 506, writ denied, 2014-0686 (La. 10/31/14), 152 So.3d 151. Such state of mind can be formed in an instant. **State v. Cousan**, 94-2503 (La. 11/25/96), 684 So.2d 382, 390. Specific intent need not be proven as a fact, but may be inferred from the circumstances and the actions of defendant. **State v. Mickelson**, 2012-2539 (La. 9/3/14), 149 So.3d 178, 182-83. The existence of specific intent is an ultimate legal conclusion to be resolved by the factfinder. **State v. Jackson**, 2018-0261 (La. App. 1st Cir. 11/2/18), 265 So.3d 928, 934, writ denied, 2018-1969 (La. 4/22/19), 268 So.3d 304. Deliberately pointing and firing a deadly

---

[5] The jury was also aware of a statement made by Natasha. Ronny testified at trial that the altercation between Myron and Jesse was about Jesse's sister, Natasha, whom Myron was attempting to date. Det. Chaney interviewed Natasha regarding the case and testified that, in that interview, she stated that her brother, Jesse, shot Myron. Natasha did not testify at trial. The jury clearly chose to believe the testimony of Darnell, Hakeem, and Ronny. See **Moultrie**, 234 So.3d at 146.

weapon at close range are circumstances which will support a finding of specific intent to kill. **State v. Broaden**, 99-2124 (La. 2/21/01), 780 So.2d 349, 362, cert. denied, 534 U.S. 884, 122 S.Ct. 192, 151 L.Ed.2d 135 (2001). Specific intent to kill may also be inferred from the extent and severity of the victim's injuries and a defendant's use of a deadly weapon to produce those injuries, which involved serious risk of death. **State v. Alexander**, 51,918 (La. App. 2d Cir. 4/11/18), 247 So.3d 981, 988, writ denied, 2018-0805 (La. 2/11/19), 263 So.3d 436. Specific intent to kill can be inferred in a second degree murder prosecution from the intentional use of a deadly weapon, such as a knife or a gun, from the circumstances and a defendant's actions, and from the extent and severity of the victim's injuries. **State v. Patterson**, 2010-415 (La. App. 5th Cir. 1/11/11), 63 So.3d 140, 148, writ denied, 2011-0338 (La. 6/17/11), 63 So.3d 1037. Whether a defendant possessed the requisite intent in a criminal case is a question for the trier of fact, and a review of the correctness of this determination is guided by the **Jackson** standard. **State v. Andrews**, 2018-0505 (La. App. 3d Cir. 2/6/19), 265 So.3d 1078, 1087, writ denied, 2019-0354 (La. 4/29/19), 268 So.3d 1035.

As stated above, the eyewitnesses testified that defendant shot Myron. Absent his claim of self-defense, which as previously discussed appears to have been reasonably rejected by the jury, the jury likewise could have rejected this contention as well. None of the witnesses mentioned seeing Myron with a gun until after defendant had fired the first shots. Though defendant now contends he attempted to shoot a gun out of Myron's hand, the ultimate result made plain defendant's intent when he pointed a gun at Myron and pulled the trigger, as defendant's act of firing a lethal weapon aimed directly towards the victim is sufficient to prove he had specific intent to kill or inflict great bodily harm. It would have been similarly apparent even if Myron had not died. See **State v. Mart**, 419 So.2d 1216, 1217 (La. 1982) (rejecting defendant's claim that he only intended to shoot over the victim's

13

head and scare him after allegedly being provoked); **State v. Pagan**, 2004-1478 (La. App. 5th Cir. 5/31/05), 905 So.2d 435, 439-42, writ denied, 2005-2003 (La. 2/17/06), 924 So.2d 1013 (after considering several factors, jury reasonably disbelieved defendant's story that he was attempting to disarm victim when "the knife cut across the victim's neck"); **State v. Guy**, 95-0899 (La. App. 4th Cir. 1/31/96), 669 So.2d 517, 522, writ denied, 96-0388 (La. 9/13/96), 679 So.2d 102 (observing that the victim was killed by only a single bullet, when defendant fired three shots at the victim's car after the victim honked his horn at defendant, did not negate the fact that defendant intentionally aimed and fired three shots in close succession directly at the victim); **State v. Kennington**, 515 So.2d 521, 522-23 (La. App. 1st Cir. 1987) (finding the jury reasonably rejected defendant's self-serving testimony that the lethal shots she fired were warning shots to disperse a crowd that had stopped and was throwing beer cans at the car in which defendant was riding); see also **State v. Hayes**, 2017-0789 (La. App. 4th Cir. 3/27/19), 2019 WL 1386493, at *11 (observing that defendant's claim of justification was based on his "wholly uncorroborated assertion" that he shot the victim after the victim retrieved a firearm from his vehicle and fired it at defendant; there was no evidence that the victim either physically possessed or fired a weapon before he was shot, although a weapon was later found wedged between the driver's seat, where the victim was shot, and the car console).

Presented with defendant's conflicting explanation regarding the events that occurred before the shooting, the jury made a credibility determination and rejected defendant's hypothesis that the lethal shooting was anything other than intentional. **State v. Trahan**, 2011-1609 (La. 7/2/12), 97 So.3d 994, 1000 ("Other scenarios involving an accidental discharge of the revolver . . . were possible but not so probable that a rational juror would necessarily have a reasonable doubt as to defendant's guilt.") (Emphasis in original). We find that the jury did not

14

unreasonably or irrationally reject defense's construction of the evening's events. This claim is without merit.

**Manslaughter**

A jury's verdict finding a defendant guilty of manslaughter is a proper responsive verdict for a charge of second degree murder. See La. Code Crim. P. art. 814(A)(3). Louisiana Revised Statutes 14:31(A)(1) defines manslaughter as a homicide which would be either first degree murder or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. The existence of "sudden passion" and "heat of blood" are not elements of the offense but, rather, are factors in the nature of mitigating circumstances that may reduce the grade of homicide. **State v. Corkern**, 2003-1393 (La. App. 1st Cir. 9/17/04), 897 So.2d 57, 62, writ denied, 2004-2627 (La. 2/18/05), 896 So.2d 29. Manslaughter requires the presence of specific intent to kill or inflict great bodily harm. See **State v. Hilburn**, 512 So.2d 497, 504 (La. App. 1st Cir.), writ denied, 515 So.2d 444 (La. 1987). It is a defendant who must establish by a preponderance of the evidence the mitigating factors of sudden passion or heat of blood to reduce a homicide to manslaughter. See **State ex rel. Lawrence v. Smith**, 571 So.2d 133, 136 (La. 1990); **State v. LeBoeuf**, 2006-0153 (La. App. 1st Cir. 9/15/06), 943 So.2d 1134, 1138, writ denied, 2006-2621 (La. 8/15/07), 961 So.2d 1158; see also **Patterson v. New York**, 432 U.S. 197, 205-06, 97 S.Ct. 2319, 2324-25, 53 L.Ed.2d 281 (1977). Further, a killing committed in sudden passion or heat of blood must be immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. **State v. Roberson**, 2013-2010 (La. App. 1st Cir. 5/2/14), 2014 WL 3843863, at *5, writ denied, 2014-1159 (La. 1/9/15), 157 So.3d 598. Thus, the evidence at trial had to establish that the provocation was such that it would have deprived an average person of his self-control and cool reflection. **Id.**

15

at *6. Provocation and time for cooling are questions for the jury to be determined under the standard of the average or ordinary person, one with ordinary self-control. **State v. Verdin**, 2016-0439 (La. App. 1st Cir. 10/31/16), 2016 WL 6427708, at *4, writ denied, 2016-2107 (La. 9/29/17), 227 So.3d 284.

Multiple witnesses testified that Myron and defendant were walking toward each other, that there was a "tussle" for defendant's gun, and that Myron reached for defendant's gun. Although defendant claims that Myron shot first and that he only shot after Myron shot Jesse, this is contradicted by witness testimony.

Here, considering the burden on defendant to mitigate the severity of the second degree murder to manslaughter, defendant failed to prove that Myron, or anyone else, did anything to deprive him of cool reflection sufficient to mitigate a second degree murder to manslaughter. At most, the testimony suggests Myron only reached for defendant's gun or "tussled" with him after becoming aware defendant was armed. This claim is without merit.

**Misidentification**

Where a key issue is a defendant's identity as the perpetrator of the crime, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof. However, positive identification by only one witness may be sufficient to support a defendant's conviction. **State v. Davis**, 2001-3033 (La. App. 1st Cir. 6/21/02), 822 So.2d 161, 163. Here, there is little question that the State provided sufficient evidence to establish beyond a reasonable doubt that defendant was the person who shot Myron. Defendant, in his own written statement to police, explained it was he who shot Myron, though defendant said that he did so only after Myron shot first. This trial strategy also had the effect of undermining the credibility of Natasha Brumfield's hearsay exculpatory claim that it was Jesse who shot Myron. This claim is without merit.

In reviewing the totality of the evidence, and assessing defendant's contentions, we cannot say that the jury's determination was irrational under the facts and circumstances presented to them. See **State v. Ordodi**, 2006-0207 (La. 11/29/06), 946 So.2d 654, 662. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the factfinder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam). To otherwise accept a hypothesis of innocence that was not unreasonably rejected by the factfinder, a court of appeal impinges on a factfinder's discretion beyond the extent necessary to guarantee the fundamental protection of due process of law. See **State v. Mire**, 2014-2295 (La. 1/27/16), 269 So.3d 698, 703 (per curiam).

## PRO SE ASSIGNMENT OF ERROR #2: CONFRONTATION ERROR

In his second pro se assignment of error, defendant argues the trial court erred in overruling trial counsel's objection to the State proceeding with the testimony of Dr. Susan Garcia instead of the unavailable Dr. Karen Ross. Counsel later sought a mistrial on the same grounds. Defendant asserts that he had the right to confront Dr. Ross, the author of the autopsy report, pursuant to **Melendez-Diaz v. Massachusetts**, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009). Defendant states that he was unable to properly cross-examine Dr. Garcia on a nine-year-old autopsy performed by Dr. Ross, at which Dr. Garcia was not present.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" Out-of-court statements that are testimonial are barred under the Confrontation Clause, unless the witness is unavailable to testify and the defendant had a prior opportunity to cross-examine the witnesses. **State v. McIntosh**, 2018-0768 (La. App. 1st Cir. 2/28/19), 275 So.3d 1, 6 writ denied, 2019-

17

00734 (La. 10/21/19), 280 So.3d 1175 (citing **Crawford v. Washington**, 541 U.S. 36, 68-69, 124 S.Ct. 1354, 1374, 158 L.Ed.2d 177 (2004)). The **Crawford** Court drew a distinction between testimonial and nontestimonial statements and confined its holding to testimonial evidence. **McIntosh**, 275 So.3d at 6 (citing **Crawford**, 541 U.S. at 61-68, 124 S.Ct. at 1370-74).

Some courts, including at least two circuits in Louisiana, have determined that autopsy reports do not create Confrontation Clause problems when they are admitted into evidence without the author's availability for cross-examination. See e.g., **State v. Francis**, 2012-1221 (La. App. 3d Cir. 4/3/13), 111 So.3d 529, 535, writ denied sub nom., **State ex rel. Francis v. State**, 2013-1253 (La. 11/8/13), 125 So.3d 449 (autopsy report had no bearing on guilt of defendant and "is likewise different from the documents intended to fall within the scope of the Confrontation Clause"); **State v. Russell**, 42,479 (La. App. 2d Cir. 9/26/07), 966 So.2d 154, 165, writ denied, 2007-2069 (La. 3/7/08), 977 So.2d 897 (information contained in coroner's report regarding death of victim was "non-testimonial" in nature, and admission of report did not violate defendant's right of confrontation). See also, **Williams v. Illinois**, 567 U.S. 50, 93-98, 132 S.Ct. 2221, 2248-51, 183 L.Ed.2d 89 (2012) (Breyer, J., concurring to suggest autopsy reports are "reliable case-specific technical information" and fall beyond "the outer limits" of "testimonial statements"); **People v. Hall**, 84 A.D.3d 79, 81-82 (N.Y. App. Div. 1 Dept. 2011) (noting **Melendez-Diaz** did not explicitly hold that autopsy reports are testimonial); **United States v. Feliz**, 467 F.3d 227, 236-37 (2d Cir. 2006) (noting thousands of routine autopsies conducted every year without regard to the likelihood of their use at trial and concluding that autopsy reports are nontestimonial). This court, prior to **Melendez-Diaz**, specifically held that another doctor testifying from a coroner's report he did not author did not violate a defendant's confrontation rights. **State v. Leonard**, 2004-1609 (La. App. 1st Cir. 4/27/05), 915 So.2d 829, 833-34, rev'd and remanded

18

on other grounds, 2005-1382 (La. 6/16/06), 932 So.2d 660. Consequently, jurisprudence suggests that there are no Confrontation Clause violations when a trial court allows one doctor to testify from the autopsy report of another.

However, we need not ultimately determine the legal issue of whether Dr. Garcia's testimony explaining Dr. Ross's autopsy report violated defendant's Sixth Amendment rights because even assuming, without deciding, there was error, we conclude any error in admitting the evidence was harmless beyond a reasonable doubt. See **State v. Williams**, 2012-0147 (La. App. 1st Cir. 9/21/12), 2012 WL 4335435, at *5, writ denied, 2012-2310 (La. 4/19/13), 111 So.3d 1028; **State v. Corner**, 2011-1849 (La. App. 1st Cir. 5/3/12), 2012 WL 1564618, at *6, writ denied, 2012-1277 (La. 11/30/12), 103 So.3d 364. Mistaken application of the rule of **Crawford** is subject to harmless error analysis. **State v. Buckenberger**, 2007-1422 (La. App. 1st Cir. 2/8/08), 984 So.2d 751, 759, writ denied, 2008-0877 (La. 11/21/08), 996 So.2d 1104.

Dr. Garcia's testimony merely reported Dr. Ross's findings that the bullet that killed Myron "entered his right thigh and then exited the side of his right thigh, resulting in the . . . cutting through completely of his right femoral artery." Based on Dr. Ross's report, Dr. Garcia concluded that Myron died as a result of the gunshot wound to his leg. In his counseled appeal, as noted above, defendant does not contest that he shot Myron, nor does he argue the wound was not ultimately fatal. Moreover, also noted above, there is no merit to defendant's allegation that it was not he who shot Myron, when three State witnesses consistently testified that they saw him do so, and when his central argument at trial, and counseled argument on appeal, was that he acted in self-defense. This claim is without merit.

## PRO SE ASSIGNMENT OF ERROR #3: PROSECUTORIAL

## MISSTATEMENT

In his third pro se assignment of error, defendant complains of an alleged inappropriate comment made by the prosecutor in opening statements. Defendant asserts that the prosecutor improperly speculated as to what defendant knew when Jesse and Samuel came to get him at his home. Specifically, the prosecutor stated that defendant knew he was getting summoned to help them in an altercation with Myron. Defense counsel objected as to the speculative nature of the statement and was overruled.

The opening statement of the State shall explain the nature of the charge, and set forth, in general terms, the nature of the evidence by which the State expects to prove the charge. La. Code Crim. P. art. 766. The opening statement is designed to inform the jury so they may understand the evidence as it unfolds and to protect a defendant from surprise. **State v. Green**, 343 So.2d 149, 151 (La. 1977). Statements made outside the permissible scope of an opening statement may result in a mistrial under La. Code Crim. P. arts. 770 and 771. **State v. Banks**, 2009-0052 (La. App. 1st Cir. 6/12/09), 2009 WL 1655006, at *2, writ denied, 2009-1609 (La. 3/12/10), 28 So.3d 1024. However, in the instant case, trial counsel did not seek a mistrial.

The Louisiana Supreme Court has stated that "a great deal of credit should be accorded to the good sense and fairmindedness of jurors who have heard the evidence and who know what was and was not proven." **State v. Dupre**, 408 So.2d 1229, 1234 (La. 1982). There is no indication that the jurors convicted defendant based on the prosecutor's arguably speculative remark. Moreover, the error, if any, in the opening statement did not affect substantial rights of defendant. See La. Code Crim. P. art. 921. Here, evidence was presented against defendant at trial, and it supported the prosecutor's alleged speculation. For instance, defendant's second statement to police explained that Jesse had entered defendant's home while

defendant was sleeping and talked loudly about the first altercation. Defendant further stated that he then got into the car with Jesse and Samuel and at some point was given a gun by Samuel. This supports the prosecutor's alleged speculation. See La. Code Crim. P. art. 921. Therefore, the State's opening statement did not affect substantial rights of the defendant. This assignment of error is without merit.

## PATENT ERROR

This court has conducted an independent review of the entire record in this matter, including a review for error under La. Code Crim. P. art. 920(2). Our review has revealed the existence of a patent sentencing error in this case. Defendant filed a motion for new trial, and the trial court denied it immediately before sentencing defendant. Louisiana Code of Criminal Procedure article 873 mandates, in relevant part that "[i]f a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled." Herein, the trial court erred by sentencing defendant immediately after ruling on the motion for new trial. Moreover, the record does not indicate even an implicit waiver of the sentencing delay by defense counsel. At most, counsel did not contest moving on to sentencing immediately following the denial of his motion for new trial. See **State v. Kisack**, 2016-0797 (La. 10/18/17), 236 So.3d 1201, 1205 (per curiam), cert. denied, **Kisack v. Louisiana**, ___ U.S. ___, 138 S.Ct. 1175, 200 L.Ed.2d 322 (2018) ("implicit waiver . . . runs afoul of the plain language of [Article] 873 that requires that the waiver be expressly made").

Nevertheless, in **State v. Augustine**, 555 So.2d 1331, 1333-34 (La. 1990), the Louisiana Supreme Court indicated that a failure to observe the twenty-four hour delay provided in Article 873 will be considered harmless error where a defendant cannot show that he suffered prejudice from the violation, and sentencing is not challenged on appeal. See **State v. White**, 404 So.2d 1202, 1204-05 (La. 1981). Assuming arguendo that defendant is contesting his sentence by raising a sufficiency

21

claim that he is only guilty of manslaughter, failure to observe the twenty-four hour delay can still be determined not to be reversible error though the sentence is challenged. In **State v. Seals**, 95-0305 (La. 11/25/96), 684 So.2d 368, 380, <u>cert. denied</u>, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997), the Louisiana Supreme Court noted that the mandatory nature of the sentence distinguished the case from **Augustine**, *supra*, and found that the reversal of the sentence for failure to wait twenty-four hours between the denial of the motion and imposition of sentence was not warranted in the absence of prejudice. <u>See also</u> **State v. Sam**, 99-0300 (La. App. 4th Cir. 4/19/00), 761 So.2d 72, 77-78, <u>writ denied</u>, 2000-1890 (La. 9/14/01), 796 So.2d 672. Defendant received a mandatory sentence of life imprisonment at hard labor. <u>See</u> La. R.S. 14:30.1(B). Accordingly, any error in the trial court's failure to observe the twenty-four hour delay is harmless beyond a reasonable doubt and does not require a remand for resentencing. <u>See</u> **Seals**, 684 So.2d at 380 ("Delay or no delay, the sentence the judge was required to impose would have been the same. Thus, no prejudice could possibly have resulted from the failure of the court to comply with the delay.").

**CONVICTION AND SENTENCE AFFIRMED.**